# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **SHARRON HARRIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No.  CV-05-S-2375-NE** |
| | ) | |
| **SEARS HOLDING CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff, Sharron Harris, asserts numerous claims against Sears Holding Corporation, an entity that she describes as her former employer.[1]  Her claims include contentions of age discrimination under the Alabama Age Discrimination in Employment Act, Ala. Code § 25-1-22 *et seq*., and the federal Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"); a disability discrimination claim under the Americans with Disabilities Act of 1990, 42 U.S.C. §

---

[1] Sears Holding Corporation contends that it is not the proper defendant to this action, in part, because Sears Holding Corporation did not, at any time, employ the plaintiff.  The entity known as "Sears, Roebuck & Co." filed an answer to plaintiff's complaint in this matter; however, Sears Holding Corporation has yet to file a responsive pleading to plaintiff's complaint.  Sears, Roebuck & Co. is not a named defendant to this action. The instant motion for summary judgment and supporting brief were filed by Sears Holding Corporation, alleging that plaintiff was employed by "Sears."  Neither party named in the caption of the complaint has filed a motion seeking to have Sears Holding Corporation dismissed as a party to this action, or to have Sears, Roebuck & Co. substituted for Sears Holding Corporation as the proper defendant.  This court will not *sua sponte* take such an action.

12101 *et seq.* ("ADA"); retaliation claims under both the ADEA and the ADA; and, supplemental, state-law claims for defamation and "false light invasion of privacy."[2] Defendant moved for summary judgment on all claims asserted by plaintiff. Upon consideration of defendant's motion as well as the parties' briefs and evidentiary submissions, the court concludes the motion should be granted, but only in part.

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 indicates that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[3] "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[2] *See* doc. no. 1 (plaintiff's complaint).

[3] Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.

The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable [factfinder] to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (internal quotations and citation omitted) (bracketed text suppled).

## II.  SUMMARY OF FACTS

Plaintiff began her employment as a cashier at the "Sears" department store located in Decatur, Alabama in either 1985 or 1986.[4] She was paid an hourly wage, and classified as a full-time employee. Her employment was terminated on February 25, 2005.

### A.    The Proposed Transfer

In November 2004, during the busiest shopping season of the year for the Sears store at issue, the store's general manager, William Anderson, decided to change plaintiff's job duties and job title from a cashier's position to a Merchandise Customer Assistant ("MCA") position. Plaintiff viewed this change as a demotion, but Sears

---

[4] *See supra* note 1.

3

considered it to be a lateral transfer, because both positions shared identical rates of compensation and required similar work hours.[5]  Prior to November 2004, other employees, including non-disabled employees who were under 40 years of age, were transferred from cashier to MCA associate positions.

Anderson discussed his decision to transfer plaintiff with the store's assistant manager, Jennifer Macris, who was plaintiff's direct supervisor.   Anderson communicated to plaintiff his decision to transfer her on November 2, 2004.  Plaintiff protested the proposed transfer, saying that she could not perform the duties of an MCA associate because of arthritis in her hands and knees.  Anderson responded that he was not aware that plaintiff suffered from arthritis, but he would allow her to remain a cashier.  Anderson had no basis for knowing whether plaintiff's alleged arthritic condition would prevent her from performing the essential duties of an MCA associate, but he nonetheless decided against effecting the transfer as an accommodation to her.  Thus, plaintiff never actually performed the duties of an MCA associate.

As a condition of plaintiff remaining in a cashier's position, however, Anderson told her that she needed to improve her "transaction time" (*i.e.*, the amount of time it

---

[5] Prior to and since November 2004, other Sears employees have been transferred from cashier to MCA associate, and such changes have always been considered by defendant as lateral transfers, as opposed to demotions or promotions.

takes a cashier to complete a sale to a customer).  Plaintiff's transaction times, according to Anderson, were too high as of November 2, 2004.  Plaintiff also was required to meet certain goals with respect to the opening of so-called "rapid credit accounts." These conditions were not specific to plaintiff, however, but were identical to those imposed on all other full-time cashiers.  It is undisputed that, within a month of November 2, 2004, plaintiff's transaction times had improved.

**B.     Plaintiff's Work Schedule**

Plaintiff also was never excluded from a cashier's work schedule, even though, due to the proposed transfer, she *temporarily* was removed from the cashiers' published work schedule for the week of October 31-November 6, 2004, and placed on the MCA associate's schedule.  Once Anderson agreed that plaintiff would continue to work as a cashier, however, Macris made manual entries on the computer-generated cashier's schedule for the week of October 31-November 6, 2004.  Furthermore, plaintiff was on vacation at the beginning of the week of October 31, 2004, and she was absent from work until November 2, 2004, when she met with Anderson and protested his proposed transfer.  For all of the foregoing reasons, therefore, plaintiff effectively was not excluded from a cashier's work schedule during the week following her protest of the proposed transfer from cashier to MCA associate.

1.      **Evening work**

Full-time cashiers were required to be available to work both daytime and evening hours.  Plaintiff, as well as any other cashier, could communicate her desire to not be scheduled to work on certain days, or at certain times of a day.  For such a request to be given consideration by management, however, it was required to be made at least one week in advance of the desired day or time.  Macris made efforts to accommodate all such requests from cashiers who were subordinate to her, including requests made by the plaintiff, but ultimately cashiers were expected to work during their scheduled shifts.  Plaintiff was aware of these policies, but she has offered evidence, through her own testimony, that she had a standing request, ostensibly in perpetuity, to not be scheduled to work during evening or night hours because of personal scheduling preferences.[6]

Sears's cashier's schedules were, at the time of plaintiff's employment, generated by a computer software program called "Schedule for Sales Growth" (hereinafter "SSG").  As plaintiff's direct supervisor, Macris would, on Tuesday or Wednesday of each week, enter scheduling information for the following week into

---

[6] There is no evidence before this court that plaintiff requested a certain schedule as an accommodation for a disability or due to her age.  Plaintiff's deposition testimony is that she desired to work during morning and afternoon hours in order to visit with and care for her mother during the evening hours.  Plaintiff's mother suffered from Alzheimer's disease.

the SSG program.  Based on the information entered by Macris, that program then generated a work schedule for each cashier for the forthcoming work-week.  Macris "double-checked" the computer-generated schedule, however, for the purpose of ensuring "that a sufficient number of cashiers had been scheduled for the times and for any other irregularities."[7]  Marcis had the authority to make revisions to the cashiers' schedule once it was generated by the SSG software program.  Even so, Macris "did not adjust the schedule to require [plaintiff] to work three nights" during the week of November 7-13, 2004.[8]  Stated differently, the computer-generated SSG program required plaintiff to work three nights during the week of November 7-13, 2004 (*i.e.*, the week after plaintiff protested Anderson's proposal to transfer her to an MCA position), and Macris — despite the fact that she possessed the authority to do so — "did not adjust the schedule."

There is no "night shift" for cashiers.  Moreover, plaintiff was never scheduled to work later than 9:00 p.m. on any given day.  Plaintiff concedes that, following her November 2, 2004 refusal to accept a transfer to an MCA associate position, the only week during which she was *scheduled* to work until 9:00 p.m. for three nights during the week was for the week of November 7-13, 2004.  Plaintiff was not thereafter

---

[7] *See* doc. no. 20 (defendant's evidentiary submission; declaration of Jennifer Macris), ¶ 11.
[8] *See id.*, ¶ 12.

7

scheduled to work more than one evening per week.  Furthermore, plaintiff was absent from work during most of the week (*i.e.*, from November 5-15, 2004) because of bronchitis and stomach ailments.  Therefore, the impact of this evening work on plaintiff was minimal at best.

### C.    Plaintiff's First EEOC Charge

During the period plaintiff was absent from work, allegedly due to bronchitis and stomach ailments (specifically, on November 8, 2004), she filed a charge of discrimination with the Equal Employment Opportunity Commission.  That charge read, in relevant part, as follows:

> I filed this charge to challenge age and disability discrimination . . . .
>
> I recently returned from vacation to discover that I had been switched to full time a [*sic*] merchandise position.  This job involves putting out merchandise, cleaning up and is physically demanding.  I have severe arthritis (drawn fingers), this effects activities daily such as getting dressed, and pealing apples.  I informed William, the manager, that I could not do the stocking duties (tagging merchandise, reaching, lifting, and carrying) and he moved me back to cashier mostly on the night schedule.  I have also been left out of the schedule.  The reassignment to stocker, and the move to night shift were thinly [*sic*] efforts to make me quit.
>
> Sears has discriminated against me and other employees as [a] class of persons because of age.  A review of the age of new hires will demonstrate that Sears is replacing older workers with younger workers.  The older employees have had their job conditions changed and are being forced out of the company.

Sears actions towards me and others is [sic] in violation of the Age Discrimination in Employment Act and the Americans with Disabilities Act.[9]

**D.    Events Following Plaintiff's First EEOC Charge**

On December 8, 2004, Anderson issued a monthly performance review to plaintiff stating that her transaction time had improved.  Thereafter, Anderson never mentioned transaction time to plaintiff.  Also in December 2004, Macris issued monthly performance reviews to all cashiers, including plaintiff.[10]  Additionally, all cashiers were subject to daily performance reviews.

At some point, Macris implemented a policy, known as the "break log-in/log-out" policy, under the terms of which all cashiers, including plaintiff, were required to notify a member of management whenever the cashier began and ended any break.  Plaintiff recalls that, pursuant to this policy, she was required to sign a log book in order to memorialize the time she spent on break.  Plaintiff does not recall whether other cashiers were also required to sign the log book.  Defendant claims that no such log book currently exists.  At an unspecified time, Macris uniformly stopped enforcing

---

[9] *See* doc. no. 26 (plaintiff's evidentiary submission; November 8, 2004 EEOC charge of Sharron Harris).

[10] Plaintiff neither admits nor disputes this fact.  Macris' sworn declaration, which was submitted as evidence in support of defendant's motion for summary judgment, states that Macris issued monthly performance reviews to those employees who were under her charge.  While plaintiff argues that such a policy did not exist, there is no evidence in the record to contradict this portion of Macris' sworn statement.

the "break log-in/log-out" policy.  In any event, neither plaintiff nor any other cashier was ever disciplined or counseled for failing to comply with the policy.

Plaintiff, along with another employee, was reminded by management of Sears' company-wide policy regarding the manner in which the company preferred customers to stand in line at a cash register.  Cashiers are responsible for ensuring that customers comply with this policy.

**E.   Plaintiff's Termination**

All of Sears' cashiers are required to perform the process of "Scan, Bag, Tender" in customer sales transactions:  a policy that prohibits the bagging of merchandise before it is scanned into the cash register's receipt system.  Defendant terms the bagging of merchandise without first scanning the item as "freebagging." Plaintiff was aware of the "Scan, Bag, Tender" policy, and she — like all other associates at the Sears store located in Decatur, Alabama — was trained in its application.  At the time of her employment, plaintiff also understood that it was defendant's policy that any violation of the "Scan, Bag, Tender" doctrine could result in the immediate termination of employment.  An employee violated the policy by placing an item in a customer's bag without first scanning that item.

On February 23, 2005, Macris was summoned to plaintiff's cash register to perform a required manager's approval of a customer's transaction.  The cash register

10

at which plaintiff was stationed contained an electronic notification system that alerted plaintiff to the need for a manager's approval of the transaction.  Once a manager's approval is automatically triggered by the cash register's electronic notification system, the sales transaction cannot be completed absent the approval, and the cashier has no alternative other than to alert a manager.  In this instance, a manager's approval was mandated because of a price discrepancy on a particular item of merchandise.

While performing the approval process, Macris noticed that a pair of jeans that had not been scanned into the cash register's receipt system had been placed in the customer's bag.[11]  Plaintiff admitted that she had failed to scan the jeans prior to placing them in the customer's bag.  Her admitted failure was inadvertent and unintentional.  Nevertheless, the act was in violation of the "Scan, Bag, Tender" policy.  Macris considered this action to fall within Sears' definition of "freebagging."[12]  After finding that the pair of jeans had not been scanned, plaintiff

---

[11] Macris testified, both during deposition and by sworn statement, that plaintiff failed to scan a pair of jeans and a pair of underwear, and that those items were placed by plaintiff in the customer's bag without them having been scanned.  Plaintiff concedes that she inadvertently placed jeans in the bag without scanning the item, but she disputes the evidence regarding the underwear. Because plaintiff admits that she did not follow the policy of "Scan, Bag, Tender" as to the pair of jeans, the question of whether she also failed to follow the policy as to a pair of underwear is not material.

[12] Plaintiff adamantly contends that she did not, on February 23, 2005, commit the offense of "freebagging."  Beyond her own testimony as to her lack of intent and her wholly conclusory statement that she did not "free bag" any merchandise on that date, plaintiff does not offer any evidence that her failure to follow the "Scan, Bag, Tender" policy in this instance does not constitute "freebagging."  "Freebagging," as it is defined by defendant, is synonymous with a violation of the

and Macris scanned the item, charged the customer, and, ultimately, all items that were in the customer's bag were scanned and paid for before the customer left the store.

Prior to the February 23, 2005 incident, Macris had been confronted by a customer who informed her that plaintiff had not charged the customer for all items that were in the customer's bag. Macris counseled plaintiff regarding this violation of the "Scan, Bag, Tender" policy, but Macris did not, at that time, report the incident. Following plaintiff's February 23, 2005 failure to follow the "Scan, Bag, Tender" policy, however, Macris reported both incidents to general manager William Anderson. Macris also reported the February 23, 2005 incident to Dustin Aker, the store's loss prevention manager. Aker was responsible for, among other things, point-of-sale transaction problems.[13] Sears' policy manuals classify the "Scan, Bag, Tender"

---

"Scan, Bag, Tender" policy. Regardless, the distinction, if any, between whether plaintiff's actions on February 23, 2005 rose to the level of "freebagging," as plaintiff understands the term, or whether "freebagging" and a violation of the "Scan, Bag, Tender" policy are, in fact, one and the same, is not material to the issues presented in the instant action. Plaintiff admits that she placed an item in a customer's bag without first scanning that item. Based on the undisputed evidence before this court regarding the nuances of the "Scan, Bag, Tender" policy, plaintiff ran afoul of the policy even when unintentionally placing the jeans in a customer's bag without scanning the item.

[13] Harris testified in regard to Dustin Aker, who began working at the Decatur, Alabama Sears store as a Loss Prevention Manager during the late summer of 2004 (*see* doc. no. 20 (defendant's evidentiary submission; declaration of Dustin Aker), ¶ 2), as follows:

Q:      [Aker] did more writeups and enforced the policies more strictly than the loss prevention people before him, correct?

A:      [Yes.] It was like he was after us more than he was shoplifters. Shoplifters were rampant. . . .

policy, or "freebagging," as "point-of-sale transaction" policies.  All Sears associates are required to strictly adhere to point-of-sale transaction policies.

Aker also considered plaintiff's February 23, 2005 action to be "freebagging,"[14] a policy infraction that was potentially terminable on the first offense.  Aker decided that plaintiff should be terminated for the February 23, 2005 incident, and communicated his recommendation to the Sears "Associates Services Center."[15]

Bobbie Proper with the Sears Associate Service Center approved the recommendation for termination based on Aker's report.  Aker communicated the decision to Anderson, who supported the decision to terminate plaintiff.  At the time Aker made the decision to terminate plaintiff, he did not know that she had filed an EEOC charge, and he did not know that she claimed to suffer from arthritis or diabetes.

On February 25, 2005, after obtaining a written statement from plaintiff in

---

He was just a young boy.  He probably just thought he was doing his job.

Dustin hadn't really worked at Sears that long because I think he really just didn't understand how things went.

Harris depo. at 117:  lines 10-17.  *See also* 118: lines 2-4; 226:  lines 3-6.

[14] Aker believed that a violation of the "Scan, Bag, Tender" policy and "freebagging" were synonymous.

[15] The location of the Sears "Associate Service Center" is not discernable from the evidence in this case; however, it is clear from the evidence that the "Associate Service Center" is not located within the Decatur, Alabama, Sears store.

13

which she admits to inadvertently placing, on February 23, 2005, a pair of jeans in a customer's bag without scanning the item, Aker discharged plaintiff from her employment.

During his time as loss prevention manager, Aker made decisions to terminate at least six other employees who violated company policies regarding point-of-sale transactions.   Plaintiff does not know of any Sears employees who were not discharged after the employee placed merchandise in a customer's bag without scanning the item; however, plaintiff testified that she was certain that violations of the "Scan, Bag, Tender" policy occurred.[16]

## F.   Plaintiff's Amended EEOC Charge

On April 4, 2005, following defendant's termination of plaintiff's employment, she filed an amended EEOC charge, claiming that her termination was motivated by: (1) retaliation because of plaintiff's first EEOC charge; (2) age discrimination; (3) and

---

[16] Harris's relevant deposition testimony is as follows:

Q:     Do you know of any Sears employees who were caught placing items into a bag without scanning them that were not terminated?

A:     I'm sure it happened.  Customers would come back, the honest ones, and say this didn't get rang [sic] up.

Q:     Do you know any employees that that [sic] happened to?

A:     No but I know it's happened.  It happens everywhere.

Deposition of plaintiff Sharron Harris at 235:  lines 13-23.

disability discrimination.

**G.    Plaintiff's Alleged Disabilities**

At the time of her termination, plaintiff was able to perform all of the duties of her job.  Plaintiff knew that she could call a "1-800 Sears" telephone number to request a disability accommodation, but she never did so.  She was required to stand up at all times while performing the duties of cashier, and she did so without requesting any accommodation.

Plaintiff enjoyed recreational walking throughout her employment with Sears, and she walked twenty minutes a day.  Prior to her termination, plaintiff would wake up early and cook breakfast for her family, and she could perform all the duties of cooking except for cutting and using a can opener.  Also, through the date of her termination, plaintiff was performing all housekeeping duties in her home, including sweeping, mopping, vacuuming, and dusting.  She washed and ironed her family's clothes, shopped for her family, and gardened as a hobby.  She was able to dress herself without assistance, but she had difficulty putting on support hose.

Plaintiff made efforts to visit her mother, who suffered from Alzheimer's disease, every night and each weekend, and she took care of her mother in the following ways: feeding, washing her mother's face, straightening her mother's bed and covers, pushing her mother in a wheelchair, and taking her mother outside.

Plaintiff's diabetes and arthritis did not substantially limit her ability to see, hear, read, learn, breathe, eat, dispose of waste, or engage in sexual intercourse.[17]

Plaintiff never submitted a doctor's excuse to Macris stating that she was unable to perform any of the duties of her cashier's position or any other job.

Plaintiff was not told by any person who was an employee of Sears — either during or following her employment that company — that she was terminated because of her age, actual or perceived disability, or for filing of an EEOC charge.[18]

## H.    Neal Tenen's Collection Letters

In August 2005, a California attorney named Neal C. Tenen, acting on behalf of Sears, Roebuck & Co., began sending letters demanding payment of civil demands under Alabama law to customers or employees of the Decatur, Alabama Sears store who had engaged in conduct for which Tenen believed that a civil demand could be sought.

Tenen sent a letter to plaintiff on August 10, 2005, claiming that: "Your former employer has requested that we contact you regarding the taking of merchandise from the store in which you were employed.  Merchandise was taken without the consent

---

[17] Plaintiff argues that she has shortness of breath; however, she did not have shortness of breath during her employment with Sears.

[18] Deposition of Sharron Harris at 177:  lines 1-10.  *See also id.* at 269:  lines 8-11; 270:  lines 4-6;  270:  lines 20-22.

of your employer . . . ."  Tenen demanded, on behalf of his client, that plaintiff pay $200 to avoid a "civil action" being brought against her.  Tenen sent a total of three such demand letters to plaintiff during the months of August and September of 2005.

Tenen admits that, prior to sending these letters to plaintiff, he did not conduct any investigation to determine whether plaintiff impermissibly took any merchandise from defendant's store without permission.  Rather, he based his three demand letters to plaintiff on information he received regarding her and the February 23, 2005 event (placing a pair of jeans in a customer's bag without first scanning the item) from a computer database utilized by defendant to store "information regarding incidents of customer or employee theft or attempted theft."[19]

In two of the three letters from Tenen to plaintiff — specifically, those dated September 14 and September 25, 2005 — Tenen states that he was attempting to amicably resolve a "shoplifting incident" that occurred at the Decatur, Alabama, Sears store.  In those letters, Tenen threatened legal action, and claimed that his client was "in the process of preparing the necessary legal papers which permit them to seek damages against you."[20]

Upon plaintiff's receipt of the first letter, plaintiff's husband, Charles Harris,

---

[19] Doc. no. 20 (defendant's evidentiary submission, Ex. 5:  declaration of Neal Tenen) ¶ 7.

[20] *See* doc. no. 20 (defendant's evidentiary submission; attachments to the declaration of Neal Tenen).

17

acting on his wife's behalf, contacted Tenen by telephone.  During that call, Mr. Harris informed Tenen that plaintiff "was not a thief," and demanded that Tenen stop writing his wife.[21]  Nevertheless, Tenen mailed plaintiff two additional letters following his conversation with Mr. Harris.  Plaintiff did not pay any of the demands made by Tenen.

Plaintiff began receiving letters from Tenen nearly six months after defendant terminated her employment.  It is undisputed that Tenen had no knowledge of plaintiff's EEOC charge against Sears at the time he corresponded with plaintiff.

### III.  MOTIONS TO STRIKE

Prior to analyzing defendant's motion for summary judgment, it is necessary to address defendant's motion to strike portions of plaintiff's evidentiary submissions[22] and plaintiff's motion to strike the declaration of Neal C. Tenen,[23] respectively.

### A.    Defendant's Motion to Strike

Defendant argues that portions of the declarations submitted by plaintiff and her husband, Charles Harris, are inadmissible hearsay, and that such evidence cannot be considered by the court when deciding a motion for summary judgment.  Plaintiff offered those declarations for the purpose, in part, of providing direct evidence that

---

[21] Doc. no. 26 (plaintiff's evidentiary submission, Ex. 5:  declaration of Neal Tenan) ¶ 13.

[22] *See* doc. no. 35.

[23] *See* doc. no. 27.

defendant believed that plaintiff was exhibiting symptoms of Alzheimer's disease prior to her discharge, and that Anderson — the general manager at the Decatur, Alabama Sears store — instructed other members of management that they needed to "get rid" of plaintiff because of her pending EEOC charge against Sears. The relevant portion of plaintiff's declaration reads as follows:

> Sherrie McConnell, a former Sears manager, informed me that in a manager meeting, former store manager William Anderson said Sears received my EEOC charge and they needed to find a way to get rid of me.
>
> McConnell also said that it was brought up that I was showing signs of Alzheimer's disease.  Sears managers, including William Anderson and Jennifer Macris knew that I regularly visited my mother who was in [a] nursing home and had been diagnosed with Alzheimer's disease.[24]

The declaration of plaintiff's husband, Charles Harris, is similar, and the relevant portion reads as follows:

> In talking with Sherry [sic] about [plaintiff], she told me about a meeting with managers just after the Store manager learned of an EEOC charge filed by [plaintiff].  She told me that William the store manager told those present that they were being sued (which was not correct).   In the conversation he mentioned that [plaintiff] was showing signs of Alzheimer's which her mother now had.  That [plaintiff] could be a liability to Sears.  They were told not to say anything to [plaintiff] about the EEOC charge but to be observant and document anything they observed about [plaintiff] that she may be doing that is against store

---

[24] *See* doc. no. 26 (plaintiff's evidentiary submission; declaration of Sharron Harris), ¶¶ 20-21.

policies.[25]

There is no evidence to support the assertion that William Anderson made the foregoing statements, other than the declarations of plaintiff and her husband recounting what McConnell allegedly told them Anderson allegedly said in McConnell's presence during a managers' meeting.   Plaintiff did not depose William Anderson, and neither party secured a sworn statement or deposition testimony from Sherrie McConnell.   On the other hand, Anderson submitted a declaration stating:

> I never told other management officials to document [plaintiff's] activities more closely than other employees.   I never told other management officials that we needed to find a way to terminate [plaintiff] because she filed an EEOC charge or anything like that.   I did not comment at a manager's meeting that [plaintiff] had Alzheimer's disease or that she was showing signs of Alzheimer's disease.   I did not have any reason to know or believe that she had Alzheimer's disease.[26]

The statements allegedly made by William Anderson in the presence of Sherrie McConnell constitute classic double-hearsay.   Plaintiff and her husband have each declared that an out-of-court declarant (McConnell) told them that another out-of-court declarant (Anderson) made certain statements, upon which plaintiff relies as substantive evidence in support of her claims.   Defendant argues that, because those portions of the declarations of plaintiff and her husband that paraphrase McConnell's

---

[25] *See* doc. no. 26 (plaintiff's evidentiary submission; declaration of Charles Harris).

[26] *See* doc. no. 20 (defendant's evidentiary submission; declaration of William Anderson), ¶ 11.

alleged recollection of out-of-court statements that were, in turn, allegedly made in her presence are inadmissible hearsay, and, because the information cannot be distilled to an admissible form, the alleged statements cannot properly be considered by this court at the summary judgment stage.

Out-of-court statements, offered for the truth of the matter asserted, that are not admissible, and cannot be reduced to admissible form at trial, should not be taken into account when considering a motion for summary judgment. *See*, *e.g., Denney v. City of Albany*, 247 F.3d 1172, 1189 n.10 (11th Cir. 2001) (holding that, when considering a motion for summary judgment, "a court may only consider evidence that is admissible or that could be presented in admissible form" at trial) (citing *Prichard v. Southern Company Services*, 92 F.3d 1130, 1135 (11th Cir. 1996) (holding that a plaintiff "cannot use inadmissible hearsay to defeat summary judgment when that hearsay will not be reducible to admissible form at trial") (in turn citing *McMillian v. Johnson*, 88 F.3d 1573, 1583-84 (11th Cir. 1996) (same))).[27]  *See also*, *e.g., Victoria*

---

[27] The Eleventh Circuit explained the standard of "evidence that may be reduced to admissible form at trial" in *Macuba v. Deboer*, 193 F.3d 1316 (11th Cir. 1999), saying:

We believe that the courts have used the phrases "reduced to admissible evidence at trial" and "reduced to admissible form" to explain that the out-of-court statement made to the witness (the Rule 56(c) affiant or the deposition deponent) must be admissible at trial for some purpose.  For example, the statement might be admissible because it falls within an exception to the hearsay rule, or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted), or is used solely for impeachment purposes (and not as substantive

*L. by Carol A. v. District School Board*, 741 F.2d 369, 373 (11th Cir. 1984) ("In adjudicating a motion for summary judgment, a court may consider any evidence that would be admissible at trial."); *Broadway v. City of Montgomery*, 530 F.2d 657, 661 (5th Cir. 1976) ("Evidence [that is] inadmissible at trial cannot be used to avoid summary judgment."); *Soles v. Board of Commissioners of Johnson County*, 746 F. Supp. 106, 110 (S.D. Ga. 1990) ("The court may consider only that evidence that would be admissible at trial.").[28]

Plaintiff responds to defendant's motion to strike by first arguing that McConnell's statements are not hearsay, because they are not being offered for the truth of the matter asserted in them. *See* Fed. R. Evid. 801(c) (defining "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, *offered in evidence to prove the truth of the matter asserted*") (emphasis

---

evidence).

*Id.* at 1323-24.

[28] Other Circuits have reached the same conclusion. *See*, *e.g.*, *Churchill Business Credit, Inc. v. Pacific Mutual Door Co.*, 49 F.3d 1334, 1337 (8th Cir.1995) (holding that a plaintiff's "testimony recounting what [another person] allegedly told him does not raise a genuine fact issue because it is hearsay"); *Firemen's Fund Insurance Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir.1993) ("Inadmissible hearsay evidence alone may not defeat a summary judgment motion"); *Wright-Simmons v. City of Oklahoma City s*, 155 F.3d 1264, 1268 (10th Cir. 1998) ("Hearsay testimony cannot be considered because a third party's description of a witness' supposed testimony is 'not suitable grist for the summary judgment mill.'") (quoting *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1995)); *United States v. Jefferson*, 925 F.2d 1242, 1252-53 (10th Cir.1991) ("Whether evidence is offered as circumstantial evidence as opposed to direct evidence has nothing to do with whether it constitutes inadmissible hearsay").

supplied).  Plaintiff states that the truth of the matter asserted in this instance is "that [plaintiff] could be a liability to Sears because of her EEOC charge or her mother's Alzheimer's disease."[29]  The court does not consider plaintiff's point, if it is a point, to be compelling.  Indeed, throughout her response to defendant's motion for summary judgment, plaintiff relies upon McConnell's alleged recounting of statements allegedly made by Anderson as evidence of the truth of plaintiff's ADA and retaliation claims: *i.e.*, that defendant regarded plaintiff as exhibiting signs of Alzheimer's disease (thereby giving credence to plaintiff's claims under the ADA); and that defendant, as a direct result of plaintiff's EEOC charge against defendant, actively engaged in retaliatory tactics to terminate plaintiff's employment.

Plaintiff also argues that the declarations are not hearsay because they are offered to show the impact of Anderson's statements on McConnell.  Plaintiff's argument in this respect eludes the court.  As discussed above, plaintiff's responsive brief makes very clear that she relies upon the out-of-court statements attributed to Anderson for the alleged "truth" of the matters asserted in them — and, thereby, as direct evidence supporting her ADA and retaliation claims — and not for the purpose of showing the "impact" of such statements upon *McConnell*.

Plaintiff's best argument is that the statements allegedly made by William

---

[29] *See* doc. no. 38 (plaintiff's response to defendant's motion to strike), p. 3.

Anderson in the presence of Sherrie McConnell during a Sears managers' meeting are not hearsay, but an admission by a party opponent.  Indeed, Federal Rule of Evidence 801 specifically provides that a statement is "not hearsay" if "[t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."  Fed. R. Evid. 801(d)(2)(D).[30]  Thus, *if Sherrie McConnell testified at trial* that, during a meeting of managerial personnel working at the Decatur, Alabama Sears store at which plaintiff then was employed, store manager William Anderson said in substance that Sears had received notice of plaintiff's EEOC charge and "they needed to find a way to get rid of [her]," or that plaintiff "was showing signs

---

[30] In full text, Rule 801(d) defines some out-of-court statements as not constituting inadmissible hearsay when:

> The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.  The contents of the statement shall be considered but are not alone sufficient to establish the declarant's authority under subdivision (C), the agency or employment relationship and scope thereof under subdivision (D), or the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered under subdivision (E).

Fed. R. Evid. 801(d)(2).

24

of Alzheimer's disease,"[31] the testimony would be admissible as *substantive evidence* under Evidence Rule 801(d)(2)(D).  *See*, *e.g.*, *Catrett v. Johns-Manville Sales Corp.*, 826 F.2d 33, 37-38 (D.C. Cir. 1997) (reversing the district court for rejecting a letter containing hearsay and granting summary judgment in favor of a defendant, because "the substance of the letter [was] reducible to admissible evidence in the form of trial testimony" by its author).  For that reason, an affidavit or sworn declaration by Sherrie McConnell to the same effect could be taken into account by this court when considering defendant's motion for summary judgment.  *See*, *e.g.*, *Williams v. Borough of West Chester*, 891 F.2d 458, 466 (3d Cir. 1990) (holding that hearsay evidence produced in an affidavit opposing summary judgment could be considered because it could later be presented at trial through testimony by the declarant).

Here, however, Sherrie McConnell has not given deposition testimony or submitted an affidavit, and plaintiff's husband, Charles Harris, acknowledged that McConnell told him that "she probably couldn't" or wouldn't testify.[32]  In the absence of trial testimony by McConnell, the second-hand statements attributed to Anderson will not be admissible as an admission by a party opponent.[33]

---

[31] *See* doc. no. 26 (plaintiff's evidentiary submission; declaration of Sharron Harris), ¶¶ 20-21.

[32] *See* doc. no. 26 (plaintiff's evidentiary submission; declaration of Charles Harris), p. 1.

[33] Further, it is undisputed that McConnell was no longer employed by Sears on the date when she allegedly made the statements recounted in the declarations submitted by plaintiff and her

In summary, plaintiff has not offered a vehicle by which the offending double-hearsay could be reduced to admissible evidence at trial. As such, and having considered the parties' arguments, defendant's motion to strike is due to be granted, and any portions of the declarations of Sharron and Charles Harris that recount statements attributed to William Anderson by Sherrie McConnell will not be considered in this court's review of defendant's motion for summary judgment. *See*, *e.g.*, *Pritchard v. Southern Co. Services*, 92 F.3d 1130, 1135 (11th Cir. 1996) (holding that a plaintiff "cannot use inadmissible hearsay to defeat summary judgment when that hearsay will not be reducible to admissible form at trial").

## B.   Plaintiff's Motion to Strike

The court now turns to plaintiff's motion to strike the declaration of Neal Tenen, an attorney whose place of residence is in the State of California. As discussed in Part II(H) of this opinion *supra*, Tenen acted as legal counsel for defendant in a matter involving plaintiff. The circumstances of that matter and of Tenen's actions on behalf of defendant form the basis, in part, of plaintiff's claims against defendant for retaliation, defamation, and false light invasion of privacy.

---

husband, portions of which are quoted in text *supra*, at notes 20 and 21. Because there is no evidence of either an agency or an employment relationship between McConnell and defendant at the time her statements were allegedly made to plaintiff and her husband, those statements cannot constitute an admission by a party opponent under Rule 801(d)(2)(D). *See supra* note 30.

Plaintiff served a subpoena, issued by the United States District Court for the Central District of California, and a Notice of Deposition by Written Questions on Tenen. He never responded. On November 6, 2006, plaintiff filed with this court a motion to compel Tenen to respond. That motion was denied as moot due to plaintiff's admission that this court was not the proper forum in which to seek an order compelling a deponent to respond to a subpoena issued by the United States District Court for the Central District of California. Plaintiff did not file a similar motion in the court that issued the subpoena, and plaintiff's attempt to contact Tenen by letter went unanswered.

On December 22, 2006, however, Tenen voluntarily submitted a declaration in support of defendant's motion for summary judgment. In plaintiff's motion to strike, plaintiff contends that Tenen's declaration should be stricken in the interests of fairness as a result of Tenen's willful failure to respond to her discovery demands and other correspondence. In support of this contention, plaintiff cites *United States v. One Parcel of Real Property Commonly Known as 901 N.E. Lakewood Drive, Newport, Or.*, 780 F. Supp. 715, 722 (D. Or. 1991), and *Inmuno Vital, Inc. v. Telemundo Group, Inc.*, 203 F.R.D. 561 (S.D. Fla. 2001). Neither of these cases

constitute binding authority, and both are distinguishable from the present situation.[34]

Without identifying any supporting evidence, plaintiff claims not to have had access to Tenen, and argues that Tenen willfully refused to respond to her subpoena, discovery demands, and written correspondence. A review of the record reveals that there is no evidence that plaintiff was denied access to Tenen, and there is no evidence to support (or contradict) plaintiff's conclusion that Tenen willfully failed to respond. The evidence before this court is that Tenen simply did not respond to plaintiff, willfully or otherwise. Plaintiff's motion to strike is due to be denied, and this court, accordingly, will consider the declaration of Neal Tenen when analyzing the merits of defendant's motion for summary judgment.

---

[34] In *United States v. One Parcel of Real Property Commonly Known as 901 N.E. Lakewood Drive, Newport, Or.*, a civil forfeiture action, the district court granted the government's motion to strike the claimant's affidavits and some affirmative defenses where the claimant refused, asserting her right against self-incrimination under the Fifth Amendment to the United States Constitution, to provide any discovery or oral testimony at deposition regarding those affidavits or defenses. 780 F. Supp. at 721. The civil forfeiture action was commenced, in part, because the claimant made admissions to IRS investigators that she consumed and distributed cocaine at the property commonly known as 901 N.E. Lakewood Drive, however, no criminal charges were brought against the claimant. *See id.* at 718-19. The district court's discussion of the government's motion to strike focused on the specific question of whether a party's affidavits or affirmative defenses should be stricken where that party relies on the Fifth Amendment when refusing to provide any information beyond the assertions in those papers. *See id.* at 721-22.

Plaintiff cites *Inmuno Vital, Inc.* for the proposition that defendant gains an unfair advantage through the use of Tenen's affidavit because plaintiff allegedly did not have access to Tenen during the discovery period in this case. In *Inmuno Vital, Inc.*, the court imposed sanctions against a *party* who refused to attend a deposition after being served with a notice of deposition by the opposing party's counsel. *See* 203 F.R.D. at 566. Tenen is not a party to the present case, and *Inmuno Vital, Inc.* does not discuss whether a non-party's declaration in support of a defendant's motion for summary judgment should be stricken from the record where the non-party declarant refused to respond to a plaintiff's notice of deposition. Plaintiff's reliance on this case is therefore misplaced.

# IV.  DISCUSSION

## A.    Plaintiff's Age Discrimination Claims

Plaintiff's age discrimination claims are brought under both the federal Age Discrimination in Employment Act ("ADEA") and the Alabama Age Discrimination in Employment Act.[35]  A plaintiff bringing an action under either the ADEA or the Alabama Act "must initially establish a prima facie case of discrimination through one of three methods:  presenting direct evidence of discriminatory intent, presenting circumstantial evidence of discrimination by satisfying the analysis set forth in *McDonnell Douglas* and its progeny, or introducing statistical evidence of discrimination." *Walker v. NationsBank of Fla., N.A.*, 53 F.3d 1548, 1555-56 (11th Cir. 1995). *See also*, *e.g.*, *Verbraeken v. Westinghouse Electric Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989) (same).

---

[35] The Alabama Age Discrimination in Employment Act provides, in part, that:

It is an unlawful employment practice for an employer to do any of the following:

(1) Fail or refuse to hire or discharge an individual, or otherwise discriminate against an individual with respect to compensation, terms, or privileges of employment, because of the age of the individual.

(2) Limit, segregate, or classify employees or applicants for employment in any way which would deprive or tend to deprive an individual of employment opportunities or to adversely affect the status of an individual as an employee, because of the age of the individual.

Ala. Code § 25-1-22 (1975) (2000 Replacement Vol.).

29

Plaintiff does not steer this court towards direct evidence of age discrimination,[36] disputed or otherwise.  As such, plaintiff's claims of age discrimination must be sustained, if they are sustained at all, on the basis of circumstantial evidence alone.  To avoid summary judgment on an age discrimination claim, a plaintiff relying on circumstantial evidence must comply with the framework created for the evaluation of the sufficiency of a plaintiff's proof of an employer's intention to discriminate in the context of Title VII disparate treatment claims.  That framework was defined by the Supreme Court in a series of three decisions rendered over a period of two decades, beginning with *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), then elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), and finally elucidated in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).  Although these cases involved discrimination claims under Title VII, a variant of the analysis also applies to claims based upon the ADEA. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141-142 (2000) (noting widespread use of *McDonnell Douglas* framework to analyze ADEA claims that are based principally on circumstantial evidence, and assuming its applicability)

---

[36] "Only the most blatant remarks, whose intent could only be to discriminate on the basis of age [or some other characteristic protected by any of the federal anti-employment-discrimination statutes] constitute direct evidence."  *Clark v. Coats & Clark, Inc*., 990 F.2d 1217, 1226 (11th Cir. 1992).

(citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311 (1996) (assuming that *McDonnell Douglas* analytical framework applies to ADEA claims based on circumstantial evidence)); *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*) (same); *Bogle v. Orange County Board of County Commissioners*, 162 F.3d 653, 656 (11th Cir. 1998) ("Since Bogle has presented no direct evidence that Orange County discharged him because of his age and relied, instead, on circumstantial evidence, the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, . . . governs his ADEA case."); *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998) (applying *McDonnell Douglas* framework in an ADEA case); *Mitchell v. Worldwide Underwriters Ins. Co.*, 967 F.2d 565, 566 (11th Cir. 1992) (same); *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1500 (11th Cir. 1991) (same); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir. 1987) (holding that the Eleventh Circuit "applies a slightly modified version of the test set forth in *McDonnell Douglas Corp. v. Green*" when evaluating the strength of circumstantial evidence to prove a *prima facie* case of age discrimination).

The analytical framework developed by *McDonnell Douglas* and its progeny has three steps. A plaintiff bears the initial burden of establishing a *prima facie* case. *See Reeves*, 530 U.S. at 142; *Chapman*, 229 F.3d at 1024; *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217 (11th Cir. 1993). "If a plaintiff establishes a *prima facie* case . . . the

employer must articulate a legitimate, nondiscriminatory rationale for the [contested employment action].  If the employer does so, the burden shifts back to the plaintiff to prove that the employer's asserted reason is pretextual."  *Young v. General Foods Corp.*, 840 F.2d 825, 828 (11th Cir. 1988); *see also Chapman*, 229 F.3d at 1024.  The goal of the three-step process is that of "progressively . . . sharpen[ing] the inquiry into the elusive factual question of intentional discrimination."  *St. Mary's Honor Center*, 509 U.S. at 506 (quoting *Burdine*, 450 U.S. at 255 n.8).

In order to make out a *prima facie* case for an ADEA violation based upon termination of the plaintiff's employment, the plaintiff must show:  (1) that she was a member of the class of persons protected by the ADEA — that is, individuals between the ages of 40 and 70;[37] (2) that she was discharged; (3) that she was qualified to perform the duties of the job from which she was dismissed; and (4) that a substantially younger person replaced her.  *See, e.g.*, *Reeves*, 530 U.S. at 142; *Bogle*, 162 F.3d at 656-57; *Turlington*, 135 F.3d at 1432; *Jameson v. Arrow Company*, 75 F.3d 1528, 1531 (11th Cir. 1996); *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207-08 (11th Cir. 1997); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1469-70 (11th Cir. 1991); *Verbraeken v. Westinghouse Electric Corp.,* 881 F.2d 1041, 1045 (11th Cir.

---

[37] The protections of the ADEA extend to those individuals who "are at least 40 years of age but less than 70 years of age."  29 U.S.C. § 621(a).

1989).  The plaintiff is not required to prove that she was replaced by someone less than 40 years of age, but only by someone "substantially younger."  *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996).[38]

In addition, the plaintiff has the ultimate burden of proving that her age was a determinative factor in the employer's adverse employment decision.

> When a plaintiff alleges disparate treatment, "liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision."  *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993).  That is, the plaintiff's age must have "actually played a role in [the employer's decisionmaking] process and had *a determinative influence* on the outcome."  *Ibid*. . . .

*Reeves*, 530 U.S. at 141 (alteration in original) (emphasis supplied).

Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to give rise to a presumption of discrimination.  *See*, *e.g.*,  *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (*per curiam*).  Despite this lax burden, the court finds that plaintiff has not demonstrated a *prima facie* case

---

[38] The Eleventh Circuit expounded the "substantially younger" requirement in *Corbin v. Southerland Intern. Trucks*, 25 F.3d 1545 (11th Cir. 1994), saying:

> Unlike race and sex discrimination cases, the plaintiff in an age discrimination case need not necessarily prove that his replacement was outside the protected class, that is, under forty years of age.  The plaintiff in an age discrimination case may establish a prima facie case merely by establishing that his replacement was younger than he, provided that the discrepancy between the ages, along with any other relevant evidence, is sufficient that a fact finder could reasonably infer age discrimination.

*Id*. at 1549.

of termination based on age discrimination.  Plaintiff does not offer *any* evidence that the cashier's position from which she was discharged was filled by anyone at all, much less by someone who was "substantially younger."  Accordingly, defendant's motion for summary judgment is due to be granted as to plaintiff's ADEA and Alabama Age Discrimination in Employment Act claims.

## B.  Plaintiff's Disability Discrimination Claims [39]

The ADA was enacted by Congress in 1990 for the stated purpose of providing "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).[40]  To achieve that

---

[39] Plaintiff seeks redress under the ADA for defendant's "termination" of her employment. Doc. no. 1 (plaintiff's complaint), ¶ 23.  In defendant's brief in support of its motion for summary judgment, defendant mistakenly attempts to expand the scope of plaintiff's claims when arguing that plaintiff has alleged discrimination based on disability "because she was told she was transferred to an MCA position and because she was moved to the night shift when the transfer was revoked." Doc. no. 19 (defendant's brief in support of summary judgment), at 23.  Plaintiff did not respond to these arguments, and this court does not find anything in the pleadings to suggest that plaintiff is asserting ADA-based claims that are rooted in facts separate from her discharge.  Assuming, *arguendo*, that plaintiff made such claims, she has abandoned those claims as a result of her failure to respond to defendant's arguments in support of summary judgment on those claims. *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (holding that summary judgment will be granted "after adequate time for discovery . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

[40] When considering the need for such legislation, Congress found that, "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination . . . continue to be a serious and pervasive social problem."  42 U.S.C. § 12101(a)(2).  Discrimination was found to persist in "critical areas" of everyday life, including "employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services."  *Id.* § 12101(a)(3).  Congress further found that discrimination against persons with disabilities took many

purpose, the ADA provides that no covered entity,[41] including private employers,[42]

> shall discriminate against *a qualified individual with a disability* because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

*Id.* § 12112(a) (emphasis supplied).

The phrase "a qualified individual with a disability" means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id*. § 12111(8).

In turn, the concept of "disability" is defined three ways: that is, as including

---

forms, ranging from "outright intentional exclusion," to "failure to make modifications to existing facilities and practices." *Id.* § 12101(a)(5). Congress concluded that there was a "compelling need" for a "clear and comprehensive national mandate" to eliminate discrimination against disabled persons, and to integrate them "into the economic and social mainstream of American life." S.Rep. No. 101-116, p. 20 (1989); H.R.Rep. No. 101-485, pt. 2, p. 50 (1990); U.S.Code Cong. & Admin.News 1990, pt. 2, pp. 303, 332.

The ADA as codified (42 U.S.C. § 12101 *et seq.*) is divided into three principal Subchapters, referred to as "Titles" in the original legislation. Title I (*id*. §§ 12111 – 12117) addresses discrimination in employment settings. Title II (*id*. §§ 12131 – 12165) covers discrimination in the provision of public services by governmental entities. Title III (*id*. §§ 12181 – 12189) deals with public accommodations and services provided by private entities. Title IV (*id*. §§ 12201 – 12213) addresses so-called "miscellaneous provisions."

[41] 42 U.S.C. § 12111(2) provides: "The term 'covered entity' means an employer, employment agency, labor organization, or joint labor-management committee."

[42] 42 U.S.C. § 12111(5)(A) provides, in relevant part, that: "The term 'employer' means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person . . . ."

(*a*) any person who has a "physical or mental impairment" that "substantially limits" one or more of the person's "major life activities," or (*b*) a person who has "a record of such an impairment," or (*c*) a person who is "regarded as having such an impairment." *Id.* §§ 12102(2)(A) – (C); *see also* 29 C.F.R. § 1630.2(g). "An individual is deemed to be 'disabled' for purposes of the ADA if he satisfies any one of these three enumerated definitions." *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 911 (11th Cir. 1996).

The ADA imposes upon employers the duty to provide "reasonable accommodations" for known disabilities, unless doing so would result in an undue hardship to the employer. 42 U.S.C. § 12112(b)(5)(A).[43]

In addition, the ADA contains a provision, similar to that contained in Title VII of the Civil Rights Act of 1964, prohibiting retaliation against persons who exercise rights conferred by the legislation, or who testify or otherwise participate in an

---

[43] 42 U.S.C. § 12112 defines the term "discriminate" as including an employer's failure to make

reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant [for employment] or an employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity . . . .

42 U.S.C. § 12112(b)(5)(A).

investigation or other proceeding under the ADA.[44]  *See* 42 U.S.C. § 12203(a).[45]

In the absence of direct evidence of a discriminatory intent,[46] a plaintiff can establish a *prima facie* case of discrimination under the ADA by showing that:  (1) she has a "disability" within the meaning of the Act; (2) she is "a qualified individual with a disability," meaning that she could perform the essential functions of the cashier's position she previously held in the Decatur, Alabama Sears store, with or without reasonable accommodation being made by the employer;[47] and (3) she was terminated because of her disability.[48]  *See*, *e.g.*, *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249,

---

[44] 42 U.S.C. § 2000e-3(a) provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subtitle, or because he has made a charge, testifies, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

[45] 42 U.S.C. § 12203(a) provides that:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceedings, or hearing under this chapter.

[46] *See supra* note 32, and the discussion in Part III(A) of this opinion.

[47] *See* 42 U.S.C. § 12111(8) (defining "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"); *see also* 29 C.F.R. § 1630.2(m) ("Qualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position").

[48] There actually is a fourth element, implicit in the interstice between the second and third: *i.e.*, "a plaintiff must demonstrate that the employer had either actual or constructive knowledge of

1255 (11th Cir. 2001); *Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11th Cir. 2000); *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998); *Doe v. Dekalb County School District*, 145 F.3d 1441, 1445, 1454 (11th Cir. 1998); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citing *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996)).[49]

The first element of an ADA *prima facie* case — proof that the plaintiff has a "disability" — has three components: *i.e.*, a plaintiff first must show that she is "impaired"; second, the plaintiff must identify a "major life activity" that she claims has been limited as a result of that "impairment"; and finally, the plaintiff must show that the "major life activity" is "substantially limited" by the "impairment." *See*, *e.g.*,

_____

the disability or considered the employee to be disabled." *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 910 (11th Cir. 1996) (citing *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996) (*per curiam*)).

[49]*See also, e.g., Pritchard v. Southern Company Services*, 92 F.3d 1130, 1132 (11th Cir.) ("In order to establish a prima facie case under the Americans with Disabilities Act of 1990, . . . Pritchard must show that: 1) she has a disability, 2) she is a qualified individual, and 3) she was discriminated against because of the disability"), *amended on reh'g*, 102 F.3d 1118 (11th Cir. 1996). Other courts of appeals have made similar findings. *See, e.g., McKay v. Toyota Motor Manufacturing*, 110 F.3d 369 (6th Cir. 1997) ("A party seeking relief under the ADA for termination must establish (1) that she is a disabled person within the meaning of the Act, (2) that she is qualified to perform the essential functions of her job with or without reasonable accommodation, and (3) that she suffered an adverse employment decision because of her disability"); *Williams v. Channel Master Satellite Systems, Inc.*, 101 F.3d 346, 348 (4th Cir. 1996) ("To establish a cause of action under the ADA, a plaintiff must demonstrate: '(1) that [s]he has a disability; (2) that [s]he is otherwise qualified for the employment or benefit in question; and (3) that [s]he was excluded from the employment or benefit due to discrimination solely on the basis of the disability'") (internal citation omitted).

*Rossbach v. City of Miami*, 371 F.3d 1354, 1357 (11th Cir. 2004). *See also*, *e.g*., *Standard v. A.B.E.L. Services, Inc*., 161 F.3d 1318, 1327 (11th Cir. 1998) ("Merely proving the existence of a physical impairment, without addressing any limitation on major life activities, is not sufficient to prove disability under the Act.") (citing *Gordon v. E.L. Hamm & Associates, Inc*., 100 F.3d 907, 910 (11th Cir. 1996)).

On the other hand, if the plaintiff's theory of recovery is that, even though she was not actually disabled, but her employer *regarded* her as "disabled," then the plaintiff must first introduce substantial evidence that the employer regarded her as having a permanent or long-term impairment that substantially limited a major life activity. *See Sutton*, 185 F.3d at 1209. A person who allegedly was *regarded* by her employer as disabled is defined by the statute as one who "(1) has an impairment that does not substantially limit a major life activity, but is treated by an employer as though it does; [or] (2) has an impairment that limits a major life activity only because of others' attitudes towards the impairment; or (3) has no impairment whatsoever, but is treated by an employer as having a disability as recognized by the ADA." *Standard*, 161 F.3d at 1327 n.2 (citing 29 C.F.R. § 1630.2(l)). "As with actual disabilities, a perceived impairment must be believed to substantially limit a major life activity of the individual." *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1230 (11th Cir. 1999).

Plaintiff asserts that there is direct and circumstantial evidence of disability discrimination.[50]  Plaintiff claims to be disabled as a result of both diabetes and arthritis.[51]  Plaintiff also claims that defendant regarded her as disabled due to Alzheimer's disease.[52]

As a threshold matter, there *is* evidence that plaintiff suffers from both diabetes and arthritis, and that defendant had knowledge that plaintiff suffered from those conditions at the time of her discharge.  It is undisputed that defendant accommodated plaintiff when she was required, for a short period of time, to wear prescription shoes as a result of complications from diabetes.  Plaintiff never requested an accommodation from defendant with regard to her job as a cashier because of arthritis, although defendant did allow plaintiff to retain her cashier position, rather than transferring her to an MCA associate position, at least in part because plaintiff told William Anderson that she could not perform the duties of the MCA associate position as a result of her arthritic condition.

Plaintiff does not allege, nor is there any evidence before this court indicating, that she suffers from Alzheimer's disease or any of that illness's terrible

---

[50] In her arguments against summary judgment, plaintiff does not distinguish between evidence she contends is direct evidence of discrimination and evidence she claims is circumstantial.

[51] *See* doc. no. 1 (plaintiff's complaint), ¶ 22.

[52] *Id.*

40

manifestations.   Plaintiff does not assert that she has ever been diagnosed with Alzheimer's disease; rather, she argues that defendant *believed that* she exhibited symptoms of the affliction.  However, plaintiff has provided no evidence beyond those portions of the declarations submitted by herself and her husband that, as discussed in Part III(A) of this opinion *supra*, are inadmissible double hearsay, in support of her allegation that defendant regarded her as having Alzheimer's disease or any of its debilitating effects.  Accordingly, because plaintiff has not provided admissible direct or circumstantial evidence that defendant believed she suffered from Alzheimer's disease, plaintiff has not established that defendant regarded her as being disabled due to that condition.

Plaintiff also has not produced any evidence that either diabetes or arthritis were impairments that substantially limited a major life activity.  Instead, the sole evidence before this court as to any limitation suffered by plaintiff as a result of those impairments is that she has trouble cutting certain foods, and that she cannot operate a can opener.  Presumably, although not stated by plaintiff, these limitations are the result of her arthritis.  The inability, because of a disability, to prepare any or most foods for oneself is arguably a limitation on a major life activity; however, such is not the case here.  It is undisputed that, at the time of her employment with defendant, plaintiff was able to prepare and eat other foods without assistance, and that, at times,

41

she assisted her ailing mother with eating.  Even though plaintiff has difficulty cutting some foods and cannot operate a can opener, it is undisputed that she was able to prepare other foods without any impairment.  Standing alone, plaintiff's difficulties with cutting and a can opener, apparently due to arthritis, is not a "substantial limitation" on a "major life activity."  As such, plaintiff is not disabled for purposes of maintaining a wrongful termination action against defendant pursuant to the ADA.

## C.    Plaintiff's Retaliation Claims

A claim of retaliation under either the ADA and ADEA is analyzed using the same framework as a retaliation claim under Title VII.  *See Griffin v. GTE Florida*, 182 F.3d 1279, 1281 (11th Cir. 1999); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997). To establish a *prima facie* case of retaliation, a plaintiff must establish that: (1) she engaged in protected activity; (2) her employer was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal linkage between her protected activity and the adverse employment action.  *See, e.g., Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999) (citing *Little v. United Techs.*, 103 F.3d 956, 959 (11th Cir. 1997)).  The establishment of a *prima facie* case of retaliation gives rise to a presumption of discrimination, and the burden then shifts to the defendant to produce a legitimate, non-discriminatory reason for the adverse employment action.  *See Reeves*, 530 U.S.

42

at 142-43; *St. Mary's Honor Ctr.*, 509 U.S. at 507-08; *Burdine*, 450 U.S. at 254.  If the defendant proffers a legitimate non-discriminatory reason for the contested employment action, the burden shifts back to the plaintiff to prove by a preponderance of the evidence the defendant's stated reason is pretextual, or unworthy of belief.  *See Burdine*, 450 U.S. at 253.

It is undisputed that plaintiff engaged in protected activity on November 8, 2004, when she filed her first EEOC charge against Sears, and that defendant had acquired actual knowledge of that fact by February 22, 2005.  Plaintiff claims that she suffered the following adverse employment actions after filing her EEOC charge:  (1) "increased scrutiny"; (2) termination; (3) harassment from Neal Tenen in the form of three collection letters; and (4) defendant's archiving of information regarding plaintiff in the company's computer database system.[53]

### 1.    Non-adverse employment actions

An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or some other conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Florida Board of Regents,* 212 F.3d 571, 587 (11th Cir. 2000).  Conduct that

---

[53] *See* doc. no. 1 (plaintiff's complaint), ¶¶ 18-20.

falls short of an ultimate employment decision must meet "some threshold level of substantiality . . . to be cognizable under the anti-retaliation clause" of the ADA or ADEA, *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998), and "an employee must show a serious and material change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1239 (11th Cir. 2001). Whether an action is sufficient to constitute an adverse employment action for purposes of a retaliation claim must be determined on a case-by-case basis, using both a subjective and an objective standard. *See, e.g., Gupta*, 212 F.3d at 587; *Doe v. Dekalb County School District*, 145 F.3d 1441, 1448-49 (11th Cir. 1998).

Even though defendant does not argue that the three collection letters mailed to plaintiff by the California attorney, or that the entry of information regarding plaintiff into a company computer database, did not constitute "adverse employment actions," this court finds that neither of those events can properly be characterized as such, for the simple reason that all such actions occurred following the termination of plaintiff's employment. *See*, *e.g*., *Lucas v. W.W. Grainger, Inc*., 257 F.3d 1249, 1261 (11th Cir. 2001) ("An employment action is considered 'adverse' only if it results in some tangible, negative effect on the plaintiff's *employment*.") (emphasis supplied).[54]

---

[54] It is undisputed that defendant did not enter any information about plaintiff into its computer database until at least three months following defendant's response to plaintiff's EEOC charge, and plaintiff did not receive any letters from Neal Tenen until nearly six months following

Furthermore, and for the following reasons, the "increased scrutiny" that plaintiff claims she suffered within a matter of days after filing her first EEOC charge was not an "adverse employment action." The "increased scrutiny" of which plaintiff complains came in the following forms:  monthly performance reviews; "coaching"; counseling regarding the manner in which customers stood in line at plaintiff's assigned cash register; a requirement that she log in and log out at the beginning and end of breaks; and performance evaluations by two supervisory employees.  It is undisputed, however, that plaintiff was neither disciplined nor discharged because of any of these instances of alleged "increased scrutiny."  More important, plaintiff was not subjected to any "scrutiny" that was not also contemporaneously visited upon all other employees.  In other words, plaintiff was not treated differently from other employees.  Defendant therefore argues that plaintiff cannot establish a *prima facie* case of retaliation based on "increased scrutiny," because she was not subjected to an "adverse" employment action. This court agrees: an employment action is not adverse unless "a reasonable employee would have found the challenged action materially adverse." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, ___, 126 S. Ct. 2405, 2415 (2006).  Plaintiff does not respond to, and thereby waives, all

---

the date of defendant's response to her charge.  Nevertheless, testimony and documentation of these events would be admissible at trial as circumstantial evidence of a retaliatory animus on the part of defendant's agents and employees.

arguments against defendant's assertion that a reasonable employee would not have found defendant's scrutiny of plaintiff's job performance or enforcement of corporate policies as being "materially adverse."[55]   An individual is not protected "from all retaliation, but [only] from retaliation that produces an injury or harm . . . a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *White*, 548 U.S. at ____, 126 S. Ct. at 2415 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (alteration added).

---

[55] Issues and contentions not raised in a party's brief are deemed abandoned.  *See, e.g.*, *Chapman v. AI Transport* 229 F.3d 1012, 1027 (11th Cir. 2000) (*en banc*) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

> In opposing a motion for summary judgment, "a party may not rely on his pleadings to avoid judgment against him." *Ryan v. Int'l Union of Operating Eng'rs, Local 675*, 794 F.2d 641, 643 (11th Cir. 1986).  There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990).  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned[.]

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (some citations omitted).

2.      **Termination and causal linkage**

On the other hand, the termination of plaintiff's employment unquestionably

was an "adverse" employment action.  Therefore, the court must determine whether

there is evidence of a causal nexus between plaintiff's initial EEOC charge and the

subsequent termination of her employment.  The demonstration of a casual linkage at

the summary judgment stage is far less onerous than proving causation by a

preponderance of the evidence at trial.  At the summary judgment stage, "a plaintiff

merely has to prove that the protected activity and the negative employment action are

not completely unrelated." *Meeks v. Computer Associates International*, 15 F.3d

1013, 1021 (11th Cir. 1994) (quoting *EEOC v. Reichhold Chemical, Inc.*, 988 F.2d

1564, 1571-72 (11th Cir. 1993)).  "At a minimum, a plaintiff must generally establish

that the employer was actually aware of the protected expression at the time it took the

adverse employment action." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913,

919 (11th Cir. 1993).  *Accord Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192,

1197 (11th Cir. 1997) ("[A] plaintiff must, at a minimum, generally establish that the

defendant was actually aware of the protected expression at the time the defendant

took the adverse employment action.").  *See also*, *e.g.*, *Gupta v. Florida Board of*

*Regents*, 212 F.3d 571, 590 (11th Cir. 2000) ("[A] plaintiff must show that 'the

decisionmakers were aware of the protected conduct,' and 'that the protected activity

47

and the adverse action were not wholly unrelated.'") (quoting *Farley v. Nationwide Mut. Ins*., 197 F.3d 1322, 1337 (11th Cir. 1999)).

Plaintiff argues that the temporal proximity between defendant's acquisition of knowledge of her EEOC charge and her termination is sufficient to create a genuine issue of material fact of a causal connection between the two events. "Close temporal proximity between the protected activity and the adverse action *may be* sufficient to show that the two were not wholly unrelated." *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1119 (11th Cir. 2001) (emphasis supplied). *See also*, *e.g.*, *Wascura v. City of South Miami*, 257 F.3d 1238, 1244-45 (11th Cir. 2001) (same). *But see Brungart v. BellSouth Telecommunications, Inc*., 231 F.3d 791, 799 (11th Cir. 2000) (observing that "[t]he general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action *is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection*") (emphasis supplied).

As the Supreme Court has observed, however, the temporal gap between events must be "very close." *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001) (*per curiam*) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001), and also citing *Richmond v. ONEOK, Inc*., 120 F.3d 205, 209 (10th Cir. 1997), and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th Cir. 1992), for

48

the proposition that three- and four-month gaps, respectively, between an employer's

knowledge of protected activity and an adverse employment action are not sufficiently

close to serve as circumstantial evidence of a causal relationship between the two

events).

Even prior to the Supreme Court's decision in *Breeden*, the Eleventh Circuit had

required that the interval between events be brief.  In *Bass*, for example, the plaintiff

began to suffer adverse employment actions within a matter of days after filing an

EEOC charge on December 19, 1995:

> In December 1995, on his first day as a Training Instructor, Bass
> was assigned to clean out a warehouse — work ordinarily done by
> inmates supplied by the Department of Corrections.  Between December
> 1995 and April 1996, Bass had no routine work assignment, performed
> custodial and clerical duties, and usually was supervised by personnel
> who were less senior than he.  Middleton, who was in charge of the
> Training Instructors, and Chief Smith ordered Bass not to record on his
> work logs the custodial and clerical work he was performing.

*Bass*, 256 F.3d at 1101.  The Eleventh Circuit found that "[t]he close temporal

proximity between filing of the EEOC complaint and the adverse actions is sufficient

in this case to satisfy the third prong of the prima facie case of retaliation." *Bass*, 256

F.3d at 1119.  Moreover, in *Donnellon v. Fruehauf Corp.*, 794 F.2d 598 (11th Cir.

1986), a case in which "the defendant's witnesses never articulated clearly and

consistently the reason that the plaintiff was discharged," *id.* at 601-602, the Eleventh

49

Circuit nevertheless held that there was substantial evidence that the plaintiff was discharged in retaliation for filing a sex discrimination complaint, *including the fact that she was discharged less than one month after filing her complaint.*

How long is too long, however?  In the *Donnellion* case cited above, the Eleventh Circuit held that a temporal gap of only one month between the plaintiff's act of filing an EEOC charge alleging that her employer denied her a sales representative position because of her sex and subsequent termination of the plaintiff's employment was sufficiently close to establish a causal nexus.  *See* 794 F.2d at 601 ("The short period of time . . . between the filing of the discrimination complaint and the plaintiff's discharge belies any assertion by the defendant that the plaintiff failed to prove causation.").

On the other extreme, temporal gaps of fifteen to twenty months are outside the pale of reasonableness.  *See, e.g., Breeden*, 532 U.S. at 274 (holding that twenty month gap "suggests, by itself, no causality at all"); *Maniccia v. Brown*, 171 F.3d 1364 (11th Cir. 1999) (holding that gaps of fifteen and twenty-one months between the employee's and employer's respective actions were too great to support a causal nexus); *see also*, *e.g.*, *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 n.4 (11th Cir. 2001) (opining that a two year break between the plaintiff's grievance and the employer's adverse action "probably would prevent a court from finding a causal

50

nexus").

Assuming, as the district court did, that the transfer to the jail was an adverse employment action, Appellant's transfer and termination occurred 15 and 21 months, respectively, after Appellant filed her grievance against her supervisor.  Far from demonstrating a pattern of retaliatory activity, these two employment actions were isolated events that had no temporal relationship to Appellant's protected activity.  The more than 15-month period that elapsed between Appellant's grievance and the alleged adverse employment actions belies her assertion that the former caused the latter.  *See, e.g., O'Connor v. Chicago Transit Auth.*, 985 F.2d 1362, 1370 (7th Cir. 1993) (9-month gap between protected activity and adverse employment action precluded reasonable inference of causation); *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) (13-month delay between protected activity and termination too long for causation to be established); *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (4-month lag between protected activity and termination not sufficient to justify an inference of causation); *cf. Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir. 1986) (averring that fact plaintiff was discharged only one month after filing complaint with EEOC "belies any assertion by the defendant that the plaintiff failed to prove causation").

*Maniccia*, 171 F.3d at 1369-70 (footnote omitted).

The *Maniccia* court's approving citation of the Tenth Circuit's opinion in *Conner v. Schnuck Markets*, 121 F.3d 1390, 1395 (10th Cir. 1997), when read in conjunction with the other decisions relied upon, appears to indicate that the expiration of four months or more between a plaintiff's engagement in protected activity and a subsequent adverse employment action nullifies any inference of causation premised solely on the temporal sequence of events.  That conclusion is

buttressed by the Eleventh Circuit's opinion in *Wascura v. City of South Miami*, 257 F.3d 1238 (11th Cir. 2001), holding that a three and one-half month interval between a plaintiff's notice to her employers of her need for extended leave, because of her son's terminal illness, and her subsequent termination did *not*,

> standing alone, show that the City's articulated reasons for her termination were pretextual, *see e.g.*, *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (holding that four-month time lag between plaintiff's participation in protected activity and his termination was, by itself, insufficient to justify an inference of causation); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (affirming district court's holding that three-month period of time between plaintiff's protected activity and termination was, standing alone, insufficient to establish a causal connection).

*Wascura*, 257 F.3d at 1245; *see also id.* at 1248 ("In light of the other evidence in the record, the three and one-half month temporal proximity is insufficient to create a jury issue on causation.").  *Cf. Sierminski v. Transouth Financial Corp.*, 216 F.3d 945, 951 (11th Cir. 2000) (holding, in the context of a retaliation claim founded on Florida's Whistleblower Act, that a temporal gap of seven months between the plaintiff's protected conduct and subsequent termination was too great to establish that the two events were casually related, especially when the record was replete with reasons for the termination unrelated to plaintiff's protected conduct).

Here, plaintiff's termination occurred over three months after she filed her first EEOC charge against Sears.  Based upon the cases discussed above, that fact would

tend to indicate that the temporal sequence between the events was not sufficiently close to suggest a causal connection.   However, the only evidence in this case speaking to the date upon which defendant acquired knowledge of plaintiff's EEOC charge is defendant's February 22, 2005 response to that charge.   If defendant acquired knowledge of the charge prior to that date, it did not inform the court.[56]

On the other hand, it is undisputed that plaintiff was terminated on February 25, 2005, *just three days after defendant submitted its written response to her EEOC charge*.   That temporal juxtaposition is damning — *i.e*., so close as to clearly give rise to an inference that there was a causal linkage between plaintiff's protected activity and her termination.

In response to plaintiff's circumstantial demonstration of a *prima facie* retaliation claim, defendant says that it legitimately terminated plaintiff's employment because of her admitted violation of the company's "Scan, Bag, Tender" policy on February 23, 2005.   Accordingly, the burden shifts back to plaintiff to "come forward with evidence, *including the previously produced evidence establishing the prima*

---

[56]Plaintiff submitted a document that she claims is the notification to Sears of her first EEOC charge.   This document is dated November 10, 2004, but it does not show that it was mailed to or otherwise received by Sears.   Defendant highlights these discrepancies, and claims that it did not receive notice of plaintiff's EEOC charge on November 10, 2004.   There being no other way for this court to discern when defendant acquired knowledge of plaintiff's EEOC charge, the court will base its analysis herein under the assumption that defendant acquired knowledge of plaintiff's EEOC charge on February 22, 2005.

*facie case*, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely pretext for intentional discrimination. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (emphasis supplied) (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804).  This court concludes that she has done so.

In this case, the "*very* close" juxtaposition of the date on which defendant submitted its written response to plaintiff's EEOC charge and the termination of her employment just three days later not only gives rise to an inference of a causal relationship between the protected activity and plaintiff's firing, but it also strongly suggests that defendant's stated reason for its action was not the true reason.  Indeed, plaintiff's unintentional violation of defendant's "Scan, Bag, Tender" policy on February 23, 2005, *just one day after Sears responded to her EEOC charge*, strongly suggests that the company recognized an opportunity to rid itself of a disgruntled employee and quickly acted upon it.  At the very least, this telling temporal sequence is sufficiently strong as to suggest, if not shout, "pretext," and to require defendant to put its stated reason for plaintiff's termination to the acid test for determining credibility:  a jury trial.  Stated differently, this court concludes that genuine issues of material fact preclude the entry of summary judgment on plaintiff's retaliation claim,

and defendant's motion for summary judgment in that respect will be denied.

## C.   Plaintiff's Defamation Claims (Libel and Slander)

Plaintiff claims that the following actions by defendant constitute defamation: (1) defendant's entry of derogatory information about plaintiff's violation of Sears' "Scan, Bag, Tender" policy into the company's computerized database system; (2) communication of the same information by defendant to its California attorney, Neal Tenen; and (3) Tenen's three "demand letters" to plaintiff, discussed in Part II(H) of this opinion *supra*.[57]

"To establish a prima facie case of defamation, the plaintiff must show that the defendant was at least negligent in publishing a false and defamatory statement to another concerning the plaintiff . . . ."  *Warren v. Birmingham Bd. of Educ.*, 739 So. 2d 1125, 1132 (Ala. Civ. App. 1999) (quoting *Nelson v. Lapeyrouse Grain Corp.*, 534 So. 2d 1085, 1091-92 (Ala.1988) (internal marks omitted)).  *See also* Ala. Code § 6-5-182 (2007) ("In an action for libel or slander, the plaintiff must prove, unless it shall be admitted by the defendant, the facts showing that the alleged defamatory matter was published or spoken of the plaintiff.").

However, "a showing that the alleged defamation was made on a privileged occasion or under circumstances and conditions which made it privileged in law

---

[57] *See* doc. no. 1 (plaintiff's complaint), ¶¶ 22-29.

constitutes a complete defense." *Warren*, 739 So. 2d at 1132.

Moreover, "a communication between corporation employees, within the line and scope of the employees' duties with the corporation, is not a publication to a 'third party.' Essentially, such a situation would be like an entity talking to itself rather than to a third party." *Burks v. Pickwick Hotel*, 607 So. 2d 187, 189 (Ala. 1992).

Furthermore, communications between an attorney and his client clearly are privileged and do not constitute publication. *See Brackin v. Trimmier Law Firm*, 897 So. 2d 207, 220-22 (Ala. 2004).

Defendant does not argue that the information communicated to Tenen was true. Because the truth or falsity of the information is not determinative in this case, this court will not address the evidence regarding the veracity of the information.  Also, there is no question that defendant had communications with Tenen regarding plaintiff.  Defendant therefore hangs its defense solely upon the premise that plaintiff's defamation claims fail as a matter of law because defendant never published to a third party any communications regarding plaintiff.  *See Warren*, 739 So. 2d at 1132.

An employee of defendant entered the following information into a company-wide computer database that is accessible by defendant's employees:

> On February 23, 2005, I, Dustin Aker was notified about an individual who was free-bagging.  As the Loss Prevention Manager, I reviewed the tape and noticed that Sharron Harris put two items (#61327006 briefs and

#65662005 Denim Jeans) without scanning these items.  Jennifer Macris, the soft lines Assistant Store Manager noticed this when she had to do an approval for this same transaction.  Jennifer questioned the two items and completed the transaction.   At this time, Jennifer came to the Loss Prevention Department and told us that this was the second time she noticed Ms. Harris putting items in bags and not charging the customer.  I questioned Ms. Harris about this incident and she said she indeed put the items in the bag without ringing up the items.  She signed a statement on 02-25-2005.[58]

Because this information was entered into the computer database, whenever plaintiff attempts to purchase merchandise at a Sears store, the cashier is instructed by an automatic electronic display on the cash register to "Call LP."  The cashier is then required by Sears' corporate policy to notify the loss prevention department before completing the sales transaction with plaintiff.  The "Call LP" instruction only appears after plaintiff provides her telephone number to the cashier and the number is entered into the computerized cash register.  Plaintiff offered deposition testimony that, from her 18 years of experience as a cashier at Sears, she believes that the "Call LP" command notifies a cashier that he or she is dealing with a "known thief."

Defendant's attorney, Tenen, accessed the computer database in the scope of his representation of defendant.  Tenen then sent letters addressed to plaintiff, and to plaintiff alone, based upon the information he gleaned from the database.  Plaintiff

---

[58]*See* doc. no. 20 (defendant's evidentiary submission; declaration of Dustin Aker), ¶ 18; *see also id.* (declaration of Neal Tenen), ¶ 9.

shared those letters with her husband.

Plaintiff does not respond to defendant's argument that communications between defendant and Tenen do not constitute publication; therefore, the court deems plaintiff to have waived or abandoned those arguments. *See U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (refusing to address a party's "perfunctory and underdeveloped argument") (citing *Flanigan's Enterprises*, *Inc. v. Fulton County*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that "fail[ure] to elaborate or provide any citation of authority in support [of an argument]" results in waiver)). Regardless, as a matter of Alabama law, defendant's communications with its attorney do not constitute publication for purposes of a defamation claim. *See Brackin*, 897 So. 2d at 220-22.

The remainder of defendant's use or storage of information, whether false or true, regarding plaintiff has been confined to either intra-company communications or computer databases. Plaintiff's only response to defendant's contentions regarding a lack of publication due to intra-company communications is plaintiff's conclusory musing that, "In this data rich world entering [plaintiff] into the Wazagua Dishonesty Profile System causes defamation."[59] Plaintiff does not cite any legal authority for the

---

[59] *See* doc. no. 25 (plaintiff's response to defendant's motion for summary judgment), p. 34. The so-called "Wazagua Dishonesty Profile System" is a computer program created by a third party and utilized by defendant. There is no evidence in this case that defendant's use of this system

premise that defendant committed defamation *per se* by entering information into a corporate database.  The court will not address plaintiff's unsupported response.  *See Astrue*, 495 F.3d at 1287 n.13.  In addition, defendant has produced uncontested evidence that it did not share information about plaintiff with a third party. Accordingly, because the communications on record in this case are wholly intra-corporate in nature, plaintiff cannot establish publication.

Because plaintiff has not established that defendant published to a third party any false statement regarding plaintiff, defendant's motion for summary judgment is due to be granted as to plaintiff's claim for defamation.  *See Warren*, 739 So. 2d at 1132.

**D.    Plaintiff's Claim for False Light Invasion of Privacy**

The Supreme Court of Alabama has said that:

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

---

causes information entered into the program to be accessible by or released to any third party.

*S.B. v. Saint James School*, 959 So. 2d 72, 93 (Ala. 2006) (quoting *Butler v. Town of Argo*, 871 So. 2d 1, 12 (Ala. 2003) (in turn quoting *Schifano v. Greene County Greyhound Park, Inc.*, 624 So. 2d 178, 180 (Ala. 1993). "A false-light claim does not require that the information made public be private, but it does require that the information . . . be false." *Saint James School*, 959 So. 2d at 93 (quoting *Regions Bank v. Plott*, 897 So. 2d 239, 244 (Ala.2004)).

"The 'false-light' version of an invasion-of-privacy claim requires that a defendant give publicity to a matter that places one in a false light." *Saint James School*, 959 So. 2d at 93. "[I]t is integral to a false-light claim that the untrue information be publicly communicated." *Butler v. Town of Argo*, 871 So. 2d 1, 13 (Ala. 2003).

> "'Publicity' . . . differs from 'publication' . . .. 'Publicity' . . . means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference is not one of the means of communication, which may be oral, written or by any other means. It is one of a communication that reaches, or is sure to reach, the public."

*Butler*, 871 So.2d at 13.

Plaintiff and defendant bitterly contest the veracity of the information concerning plaintiff that was entered into the defendant's computer database system. In its analysis of plaintiff's false light invasion of privacy claim, the court need not

60

reach the issues concerning the competing evidence as to whether the information was false because plaintiff ultimately cannot show that defendant gave publicity to the information.  Assuming, without deciding, that defendant caused false information to be entered into its computer database, the court turns to the necessary element of publicity by defendant, which plaintiff bears the burden of demonstrating in order to maintain a claim for false light invasion of privacy. *See, e.g., Saint James School*, 959 So. 2d at 93 (the Alabama Supreme Court affirmed the trial court's finding that the plaintiffs, when responding to a motion for summary judgment, did not satisfy their *prima facie* burden to sustain a claim for false light invasion of privacy where the plaintiffs did not present evidence of publicity by the defendants).

Plaintiff has not presented any evidence that defendant communicated false information regarding plaintiff to the public at large.  It appears, based on the evidence presently before this court, that defendant's database has only been accessed by defendant's employees and by defendant's attorney, Neal Tenen.  Also, in plaintiff's response to the instant motion for summary judgment, plaintiff refers to the database at issue as belonging to "Sears," and there is no evidence that the database is accessible by members of the general public, or that, at the cause of defendant, the

public at large has been made privy to false information regarding plaintiff.[60]

## IV. CONCLUSION

For the reasons stated herein, defendant's motion for summary judgment is due to be granted in part and denied in part.  An appropriate order consistent with this memorandum opinion will be entered.

DONE this 15th day of April, 2008.

_____
United States District Judge

---

[60]In her response to the instant motion, plaintiff suggests that the events of her being escorted from the Decatur, Alabama, Sears store following her discharge and of the "Call LP" instruction discussed above somehow rise to the level of either, or both, defamation or of publicity by defendant of false information about plaintiff. Plaintiff argues that these actions by defendant publicize that plaintiff is a thief; however, plaintiff does not offer any explanation or evidence, beyond her own conclusions, as to why this is so.  These suggestions are unsupported by any citations to legal authority, and plaintiff concludes without explaining that these actions by defendant constitute an amorphous wrong against plaintiff that fits within the framework of a claim for either, or both, defamation or for false light invasion of privacy.  Because these arguments are neither fully developed nor bolstered with legal authority, the court will not give them consideration. *See, e.g., Astrue*, 495 F.3d at 1287 n.13.